# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MARC GALLI,

      Plaintiff

v.

ANTHONY RUSH, et al.,

      Defendants

Case No.: 2:22-cv-00023-APG-NJK

**Order (1) Granting in Part Defendants'
Motion for Summary Judgment and
(2) Remanding State Law Claims**

[ECF No. 23]

Plaintiff Marc Galli filed a lawsuit in state court against the City of Henderson, Henderson Police and Fire Departments, and the police officers and paramedics who responded to his 911 call for help after he took a new medication and believed he was dying. Galli alleges excessive force and substantive due process violations under 42 U.S.C. § 1983, as well as state law claims of negligence, medical negligence, battery, negligent hiring and training, and intentional and negligent infliction of emotional distress. The defendants removed the case to this court based on federal question jurisdiction. They now move for summary judgment on all claims, arguing that their behavior was reasonable, they did not violate any clearly established law, and they are shielded from liability by various immunities. I grant the motion as to Galli's § 1983 claims. I decline to exercise supplemental jurisdiction over Galli's remaining state law claims and remand those to state court.

## I. BACKGROUND

Galli alleges that around 6:00 p.m. on September 24, 2020, he took an antibiotic for a nose infection. ECF No. 1-2 at 5. An hour later, he began feeling sick, had difficulty breathing, and called 911 several times. ECF Nos. 23-12 to 23-14. During the calls, Galli can be heard crying and retching, and he repeatedly stated his belief that he was dying and that his wife

Doreen had poisoned him with the help of his prescribing doctor. ECF No. 23-12.  Doreen can be

heard in the background stating that Galli had just taken something. *Id.* at 1:54.  She testified that

it was Galli's habit to have edible THC in the evenings and at the time she believed he had taken

some, but she later realized that she was wrong. ECF No. 27-2 at 40, 50-51.  Galli denied

consuming any THC. ECF No. 27-1 at 113.

Galli left the house wearing only his boxer underwear and encountered Officers Myers[1]

and Filsinger of the Henderson Police Department (HPD).  The officers tried to get him to sit

down as Galli cried, told them he was dying and melting, and asked them not to let Doreen come

near him.[2] ECF No. 23-8 at 1:04-1:50, 2:42.  Officer Myers' report stated Galli was sweating,

speaking incoherently, and acting paranoid. ECF No. 23-22 at 2.  An ambulance arrived shortly

thereafter, and Galli voluntarily climbed in and laid down on the gurney. ECF Nos. 23-9 at 4:33;

27-1 at 159.  Myers and Filsinger left the scene once paramedics indicated they no longer needed

assistance. ECF No. 23-22 at 2.

The parties dispute what happened next, which was not captured on video.  Galli testified

that while he and Anthony Rush, one of the responding paramedics, were alone in the back of the

ambulance, Rush became aggressive, pounded on something, demanded Galli tell him the whole

story, took out his phone, and told Galli, "I'm recording you." ECF No. 27-1 at 161-62.  Galli

testified Rush then hopped out of the back and went around the side of the ambulance to speak to

the driver, Edward Pickup, about drugs. *Id.* at 162-63.  Galli felt he was in danger, unbuckled the

---

[1]  There are different spellings of Officer Myers' name in the record, so I use the spelling from
her incident report. ECF No. 23-22 at 2.

[2]  Some of the interactions between Galli and the defendants were recorded on body-worn and
dashboard cameras.  Where that footage is cited, times for the videos are approximate.

gurney's safety straps, stepped out of the ambulance, and told the paramedics they were fired. *Id.* at 163, 165.

Rush testified that he did not pull out his cell phone or demand Galli tell him everything, and Pickup testified that Rush did not come around to the driver's window to talk. ECF Nos. 27-6 at 46; 27-7 at 43. Instead, Rush testified that Galli said he had taken some THC and thought the paramedics were trying to kill him. ECF No. 27-6 at 62. According to Rush, Galli saw Rush open the narcotics safe and then Galli jumped off the gurney and put up his hands to fight while the ambulance was still in motion. ECF No. 27-6 at 46, 75, 78. Rush called out to Pickup to stop, and Rush and Pickup testified that Galli got out of the back of the ambulance and started running away. *Id.* at 47-48; ECF No. 27-7 at 41-42.

Rush radioed for the police to return. ECF No. 27-6 at 48. Pickup testified that when the paramedics next found Galli, he was trying to get into houses and jumping over walls. ECF No. 27-7 at 44. Galli denied trying to get into houses, and instead testified he was talking to a neighbor because he wanted to ask for a ride to the hospital. ECF No. 27-1 at 184-186. Officer Filsinger arrived while paramedics were watching Galli from the neighbor's driveway. ECF Nos. 23-6 at 1:00; 23-18 at 2. As Officer Filsinger approached the doorway, Galli jumped over the neighbor's patio wall and ran down the street, past Officer Myers into the dark. ECF Nos. 23-7 at 1:00-1:24; 23-10 at 1:05-1:15. Officer Filsinger followed on foot, and Officer Myers and the paramedics followed in their vehicles. ECF No. 23-11 at 1:15-2:42.

As Galli slowed, Officer Filsinger told him that the paramedics were there to help. ECF No. 23-7 at 2:38. Galli replied that he was already dead, did not want to be touched, and turned toward Filsinger while raising his hands. *Id.* at 2:42-2:57. Officer Filsinger interpreted Galli's behavior as an attack, and he simultaneously tackled Galli to the ground and struck Galli in the

1  face. ECF No. 23-18 at 3.  Officer Myers and other paramedics helped restrain Galli on the

2  ground as he cried out that he could not breath and was being murdered. ECF Nos. 23-10 at 2:45-

3  3:47; 23-11 at 2:50-3:15.  Both officers as well as Pickup stated that Galli was kicking and trying

4  to fight them off, and the body cam footage shows a struggle. ECF Nos. 23-18 at 3; 23-22 at 3;

5  27-7 at 45-46; 23-10 at 2:45-3:20.  Galli testified that he was not resisting and tried to comply

6  with officer commands while he was on the ground, but he could not because their weight was

7  on his back. ECF No. 27-1 at 196-97.

8      While Pickup held Galli's arm, Rush administered 320 milligrams of ketamine, a narcotic

9  sedative. ECF Nos. 27-7 at 48; 27-6 at 52-53.  Clark County emergency medical care protocols

10  suggest a dose of 2-4 milligrams per patient's kilogram weight. ECF No. 23-16 at 12.  Rush

11  estimated Galli's weight to be 175 pounds, or approximately 80 kilograms. ECF No. 23-15 at 4.

12  However, the hospital reported Galli's weight to be 155 pounds, making the maximum

13  recommended dose closer to 280 milligrams. ECF No. 27-9 at 44.  Galli was restrained face

14  down on the ground for two to three minutes as the ketamine took effect, and then was

15  handcuffed, turned face up, and lifted onto a gurney. ECF Nos. 23-10 at 3:30-6:50; 23-7 at 3:40-

16  7:00.  He remained handcuffed until he was placed in the ambulance, then was given oxygen and

17  transported to St. Rose hospital. ECF No. 23-7 at 10:25-11:10; 23-15 at 7.

18      Galli was intubated in the emergency room, although the parties dispute what caused the

19  need for intubation.  Galli points to evidence that it was because he received too much ketamine

20  and was overly sedated. ECF Nos. 27-9 at 43; 27-8 at 11.  The defendants point to evidence that

21  Galli was breathing normally on arrival, and the emergency room physician decided to intubate

22  "[b]ecause of [Galli's] trauma and altered mental status and intermittent combative behavior."

23  ECF No. 23-17 at 7-8.  Hospital records indicated Galli had abrasions on his face, chest, flank,

and upper and lower extremities, particularly his knees. *Id.* at 7.  Galli testified that he had a partially collapsed lower lobe in his lung and a dislocated rib, remained unconscious for several days, and was in the ICU for six days. ECF No. 27-1 at 201, 203-05.  His discharge summary indicates Galli was treated for acute respiratory failure and received respiratory therapy. ECF No. 23-17 at 2.  He also received x-rays, CT scans, and other diagnostic tests, which did not reveal further injuries. *Id.* at 11; ECF No. 27-1 at 204-05.  Galli was discharged with a Mucinex prescription and instructions to follow up with his primary care physician. ECF No. 23-17 at 4.

Galli later testified that his thinking was confused at the time he called 911, and he does not believe his wife was trying to kill him. ECF No. 27-1 at 123, 126.  The record does not definitively establish the cause of his confused thinking or his physical symptoms prior to the administration of ketamine.

## II.  DISCUSSION

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. County of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).  At this stage, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are not my

functions; those are "jury functions." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034 (9th Cir. 2006) (quotation omitted).

### A.  Section 1983 Claims

To prevail on a claim under § 1983, a plaintiff must show "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  The defendants do not dispute that they acted under color of law, but they argue they did not violate Galli's rights and are shielded by qualified immunity.

In evaluating whether qualified immunity applies, I "must determine whether: (1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 617 (9th Cir. 2018) (quotation omitted).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022) (quotation omitted). Existing caselaw "must place the lawfulness of the particular action beyond debate." *Gordon v. County of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (simplified).  Furthermore, I must define the right "at the appropriate level of specificity," not at a "high level of generality," before determining if it was clearly established. *Id.* at 968-69 (simplified).

#### 1.  Excessive Force

"Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010).  In evaluating an excessive force claim, I ask "whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them." *Williamson v. City of Nat'l*

*City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (simplified).  This generally means considering "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Id.* (quotation omitted).

I consider all relevant objective "facts and circumstances confronting the officers, without regard to their underlying intent or motivation" and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020) (simplified).  And I must consider the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (quotation omitted).  Although "police misconduct cases almost always turn on a jury's credibility determinations," I may decide reasonableness "as a matter of law if, in resolving all factual disputes in favor of the plaintiff, the officer's use of force was objectively reasonable under the circumstances." *Id.* at 1056; *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (internal quotation omitted).

### a. Claim 1: Officers Myers and Filsinger

Officers Myers and Filsinger move for summary judgment on the claim that they violated Galli's Fourth Amendment right by tackling him to the ground and restraining him while paramedics sedated him.  They argue their use of force was reasonable, and even if it was not, they are shielded by qualified immunity.  Galli responds that he was never warned to stop or that he was under arrest, his long hospital stay evinces the unreasonableness of the defendants' force,

1 and it is clearly established that it is unlawful to use significant force on a person who is

2 passively resisting officer commands.  I grant summary judgment to Officers Myers and

3 Filsinger on Galli's excessive force claim because their use of force was objectively reasonable

4 as a matter of law.  And even assuming a jury could find the applied force was unreasonable,

5 they are shielded by qualified immunity.

6     I begin by analyzing the type and amount of force used against Galli.  It is undisputed

7 that Officer Filsinger hit Galli in the face as he tackled him to the pavement, and that Officer

8 Myers helped hold Galli on the ground while paramedics administered ketamine.  An officer

9 who had a realistic opportunity to intervene when a fellow officer uses excessive force may be

10 liable for failing to intercede. *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000), *as*

11 *amended* (Oct. 31, 2000).  Assuming without deciding that each officer here may be liable for

12 the other's actions, I will consider their use of force together.

13     The takedown caused numerous abrasions to Galli's head, arms, and legs, and he testified

14 to having a dislocated rib and partially collapsed lung. ECF No. 27-1 at 204-06.  Galli can also

15 be heard on the body cam footage crying out that officers were breaking his shoulder and his arm

16 as they were holding him down, although x-rays revealed no broken bones. ECF Nos. 23-10 at

17 3:10-3:30; 27-1 at 204-05.  Galli further points to his prolonged unconsciousness and extended

18 hospital stay as evidence of the amount of force officers applied. ECF No. 27 at 18.  But even

19 viewing the facts in a light most favorable to Galli, the record does not support the contention

20 that Officers Myers and Filsinger caused those injuries, so I do not consider them here.

21     Characterizing the amount of force in a takedown depends on the specific factual

22 circumstances of the case. *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021).  Here, a

23 reasonable jury could find Galli's numerous abrasions, partially collapsed lobe, and dislocated

rib were more than a "minimal intrusion." *See Williamson*, 23 F.4th at 1152 (describing officers carrying out a protestor who was acting as dead weight as a "minimal" use of force despite causing a sprained wrist and torn rotator cuff, and noting officers "did not strike Williamson, throw her to the ground, or use any compliance techniques").  But a reasonable jury could not conclude the takedown was a "substantial" use of force. *See Jackson*, 268 F.3d at 650, 652 (breaking a suspect's finger while tackling and handcuffing her was "minimal" force); *Andrews v. City of Henderson*, 35 F.4th 710, 716 (9th Cir. 2022) (tackling suspect to the ground with enough force to fracture his hip, resulting in excruciating pain and two surgeries, was substantial use of force); *Rice*, 989 F.3d at 1121 (deliberately tripping and throwing suspect to the ground while holding his arms behind his back, resulting in immediate "extreme pain" and long-term pain requiring medical treatment, was substantial use of force).  And although I may consider whether alternative methods were available in assessing the type and amount of force, I must keep in mind that officers "are not required to use the least intrusive degree of force possible." *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quotation omitted).  Here, the risk of harm from tackling Galli to the concrete and holding him down, as well as the actual harm from that use of force, was relatively low.

In assessing the government's interest in the use of force, I evaluate "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017) (en banc) (quotation omitted).  When officers are acting as community caretakers, such as responding to a 911 call for help, I focus on the seriousness of the situation unfolding rather than the severity of the crime. *Ames v. King County*, 846 F.3d 340, 349 (9th Cir. 2017).  Here, officers were responding to

1  Galli's repeated calls to 911 stating that he had been poisoned and was dying.  When officers

2  arrived, they found him walking through the neighborhood barefoot in his underwear, sweating,

3  crying, and stating that his wife was trying to kill him. ECF Nos. 23-22 at 2; 23-8 at 1:35-1:50.

4  In the body cam footage, Galli appears able to breathe and move unassisted, making the situation

5  appear less severe than it could be.  But even viewing the facts in his favor, Galli's agitation,

6  accusations, and potential health concerns were serious enough for this factor to moderately

7  weigh in the officers' favor.

8         The second factor, whether Galli was a danger to himself or others, also weighs in the

9  officers' favor.  On the body cam footage, Galli generally appears evasive rather than

10  threatening.  But he also appears confused and paranoid, states that he is dying and melting, and

11  runs away from officers in dark streets wearing only his underwear. ECF Nos. 23-8 at 1:06, 1:35,

12  2:40; 23-7 at 1:15-1:30, 2:45-2:50.  Galli has explanations for his lack of clothing and for

13  running away from the paramedics, but he points to no evidence that those explanations were

14  known to officers at the time.[3]  A reasonable officer on the scene would likely have seen Galli's

15  behavior as either a severe negative reaction to drugs or medication, in which case he needed

16  medical attention, or the result of some sort of psychosis or delirium, in which case he may have

17  been a danger to himself or others.[4]  And while the governmental interest in the use of force is

18

---

19  [3]  Galli alleges that Rush interrogated him in the back of the ambulance, but Rush said nothing

20  about that when Officer Filsinger returned to the scene.  Instead, Rush told Filsinger that Galli
   "freaked out, jumped up, and jumped out of the back." ECF No. 23-7 at 1:05.

21  [4]  Galli disputes that he was experiencing excited delirium and argues that excited delirium is not

22  a valid basis for a legal hold. ECF No. 27 at 4-5.  But whether he was in fact experiencing
   delirium is not dispositive of the excessive force question.  Even assuming officers were
   mistaken about the delirium, Galli nevertheless objectively appeared to need some kind of help.

23  *See Est. of Strickland v. Nevada County*, 69 F.4th 614, 621 (9th Cir. 2023) ("When an officer's
   use of force is based on a mistake of fact, we ask whether a reasonable officer would have or
   should have accurately perceived that fact." (simplified)).

lesser when dealing with mentally disturbed individuals than it is when apprehending serious criminals, a lesser degree of force was used here. *Bryan*, 630 F.3d at 829.  Whatever the explanation for Galli's behavior, the responding officers had at least a moderate interest in ensuring that Galli received emergency medical care and caused no harm to himself or others while running through the dark streets.  Given Galli's calls for help and seemingly erratic behavior, this factor weighs moderately in the officers' favor.

The third factor, whether Galli was evading or resisting arrest, is neutral.  Galli was not suspected of a crime, and while he clearly ran away from officers, they never told him to stop. Viewing the facts in a light most favorable to Galli, a jury could find he evaded but did not resist officers prior to the takedown, and he testified that during the struggle on the ground he tried to comply with officer commands but could not because of their weight on his back. ECF No. 27-1 at 196.  Although Myers and Filsinger stated that Galli resisted arrest and the video shows a struggle, the video is not incompatible with Galli's version of events.  This factor therefore does not weigh heavily in either direction.

Considering the seriousness of the situation and the risk of harm to Galli or others, the government had a moderate interest in its use of force.  Balancing the relatively low use of force deployed against the government's moderate interest in that use of force, I find that no reasonable jury could conclude the officers' use of force was excessive.

But even assuming that a jury could find their force was excessive, Officers Myers and Filsinger are shielded by qualified immunity.  To defeat qualified immunity, Galli bears the burden of showing that the allegedly violated right was clearly established. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).  He argues that he was never told to stop, and it is clearly established that officers may not use significant force on a person engaged in

1    passive resistance. ECF No. 27 at 21.  But here, the officers' use of force was not comparable to

2    other significant uses of force, and therefore they were not on notice that their force was

3    excessive. *See Bryan*, 630 F.3d at 830-31 (tasing a driver stopped for a seatbelt infraction who

4    shouted gibberish, slapped his thighs, and ignored an order to remain in his car was an

5    unreasonable use of force); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130

6    (9th Cir. 2002), *as amended* (Jan. 30, 2002) (pepper spraying nonviolent protestors locked

7    together was unreasonable use of force); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1094 (9th

8    Cir. 2013) (tasing a suspect's neighbor who engaged in no behavior that could have been

9    perceived as threatening or resisting was unreasonable use of force).  It is not clearly established

10   that an officer violates the Fourth Amendment by using a low level of force while responding to

11   a medical or psychiatric emergency.  Galli argues that his own medical emergency cannot create

12   the need for officers' use of force, but he cites no binding case law establishing that proposition.[5]

13         Finally, to the extent Galli argues that the officers are liable for all his injuries, including

14   his prolonged hospital stay, because they failed to intervene in the paramedics' administration of

15   ketamine, he does not point to supporting case law.  And even if an officer's duty to intercede in

16   others' constitutional violations extends to disrupting a paramedic's administration of a sedative,

17   the officers are shielded by qualified immunity because I find no case law clearly establishing

18   that duty.  A reasonable jury could not find that Officers Myers and Filsinger used excessive

19

20

21   ---

[5]  Galli points to *Rascon v. Brookins*, which he argues is "virtually on all fours with what

22   happened" here. ECF No. 27 at 19.  But in that case, four officers piled onto the person in
     medical distress, one kicked him with enough force to break three of his ribs, and they ultimately

23   killed him. *Rascon v. Brookins*, No. CV-14-00749-PHX-JJT, 2018 WL 783675, at *6 (D. Ariz.
     Feb. 8, 2018).  *Rascon* does not clearly establish that using a low level of force against a person
     suffering a medical or psychiatric emergency violates the Fourth Amendment.

1  force.  And even assuming it could, the officers are entitled to qualified immunity.  I therefore

2  grant the defendants' motion on count one.

3  *b. Claim 2: Paramedics Rush and Pickup*

4  Rush and Pickup move for summary judgment on the claim that they violated Galli's

5  Fourth Amendment rights by restraining and sedating him.  Galli responds that they are not

6  entitled to qualified immunity because it is clearly established that paramedics cannot knowingly

7  overdose a patient when there is no valid basis for administering a sedative.  The parties do not

8  dispute that paramedics are state actors under § 1983 who may assert a qualified immunity

9  defense to a Fourth Amendment excessive force claim.[6]  Taking this as true, I find that even if a

10  reasonable jury could conclude Rush and Pickup used excessive force, they are shielded by

11  qualified immunity.

12  I first consider the type and amount of force applied considering the specific factual

13  circumstances of the case.  It is undisputed that Pickup held Galli while Rush administered 320

14  milligrams of ketamine.  Assuming without deciding that each paramedic may be liable for

15  failing to intercede in the other's use of force, I will consider their actions together.

16  Galli argues this sedation rendered him unconscious for three days and led to his long

17  hospital stay.  Although the defendants argue that Galli has not shown the ketamine caused his

18  injuries, Galli has presented evidence that he was intubated because he was overly sedated. ECF

19  Nos. 27-9 at 43; 27-8 at 11.  Viewing the facts in a light most favorable to him, a reasonable jury

20

21  ---
[6]  This is consistent with how other federal courts approach these kinds of excessive force

22  claims. *See, e.g.*, *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 222 (6th
Cir. 2007); *Thompson v. Cope*, 900 F.3d 414, 420-22 (7th Cir. 2018); *Buckley v. Hennepin*

23  *County*, 9 F.4th 757, 762 (8th Cir. 2021); *see also* Osagie K. Obasogie & Anna Zaret, *Medical
Professionals, Excessive Force, and the Fourth Amendment*, 109 Calif. L. Rev. 1, 5 n.25 (2021)
(collecting cases).

13

could find the ketamine caused his intubation-related injuries and his prolonged unconsciousness.  Furthermore, although the Ninth Circuit has not characterized administration of a narcotic sedative as a significant level of force, it is arguably comparable with other significant uses of force. *See, e.g.*, *Bryan*, 630 F.3d at 825-26 (finding tasers to be a significant use of force in part because they cause immobilization and loss of muscle control).  Galli has also presented evidence that using ketamine is contraindicated in patients with blood pressure as high as his was at the time of the incident. ECF No. 27-8 at 11.  Officers, and presumably paramedics, are not required to use the lowest level of force possible, but it is still notable that Rush administered the maximum guideline dose based on an overestimation of Galli's weight despite knowing about the contraindication. ECF No. 27-6 at 58-59.  Considering both the actual harm Galli experienced as well as the risk of harm, a reasonable jury could find the administration of ketamine was a significant use of force.

The government's interest in the administration of ketamine is comparable to its interest in Officers Myers and Filsinger's use of force.  Rush and Pickup responded to repeated, desperate 911 calls for help, observed Galli stating that his wife had poisoned him, and saw him running barefoot through the neighborhood in his underwear evading the police. ECF Nos. 27-6 at 62; 27-7 at 44-45, 47.  A reasonable paramedic would likely view this behavior as either a severe reaction to drugs or medication (or, taking Galli at his word, poison), or the result of some kind of delirium.  Galli argues that even if his behavior might have appeared erratic to an outsider, Rush and Pickup knew he was running away because they previously tried to drug and interrogate him. ECF No. 27 at 22.  While I must view the facts in a light most favorable to Galli and presume that to be true, the excessive force analysis examines the objective facts confronting officers (and arguably, paramedics) without regard to their underlying intent or motivation.

*Monzon*, 978 F.3d at 1157.  Regardless of their subjective motivation, Rush and Pickup were confronted with a patient who was crying, retching, claiming poisoning, and running away in the dark.  From the perspective of a reasonable paramedic confronting the objective circumstances, they had at least a moderate interest in sedating Galli to ensure he received emergency medical care and caused no harm to himself or others.

Weighing the significant application of force against the moderate government interest, a reasonable jury could find sedating Galli to be an excessive use of force.  But Rush and Pickup are shielded by qualified immunity.  First, Galli does not point to any authority for the proposition that as a paramedic, Pickup had a clearly established duty to intervene in Rush's purported constitutional violation.  And more importantly, Galli points to no binding authority, nor have I found any, clearly establishing that a paramedic's administration of a sedative under comparable circumstances constitutes excessive force under the Fourth Amendment.

In the limited cases addressing excessive force claims in the context of emergency medical responses, courts have taken differing approaches.  The Sixth Circuit focuses on whether the responder was acting in a law enforcement capacity or an "emergency-medical-response" capacity.[7]  The Seventh and Eighth Circuits have generally focused on the same inquiry.[8]  The

---

[7]  *See McKenna v. Edgell*, 617 F.3d 432, 439-40 (6th Cir. 2010) (denying qualified immunity to officers responding to a 911 call about a seizing man because, in restraining the man and searching his home, they acted in a law enforcement capacity); *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 222 (6th Cir. 2007) (granting qualified immunity to paramedics responding to a call about epileptic seizures because, although their restraints ultimately killed the patient, they were attempting to provide medical aid).

[8]  *See Thompson v. Cope*, 900 F.3d 414, 423-24 (7th Cir. 2018) (granting qualified immunity to paramedic who administered a sedative to a restrained but combative suspect because it was not clearly established that "administering a therapeutic drug in response to a medical emergency" was a Fourth Amendment violation); *Taylor v. City of Milford*, 10 F.4th 800, 812 (7th Cir. 2021) (reversing the grant of qualified immunity to an officer who restrained a man having a diabetic emergency because it was disputed that the officer was providing medical care); *Buckley v.*

1 Second Circuit takes a different approach, asking whether the person presented a danger to

2 themselves or others.[9]  No matter which approach I apply, it is not clearly established that Rush

3 and Pickup used excessive force by administering ketamine.

4         Here, unlike in *Green*, an objectively reasonable paramedic could have believed that

5 Galli, who repeatedly stated he was dying before running from officers and paramedics down

6 dark streets, presented a danger to himself or others.  Furthermore, unlike the officers in

7 *McKenna* or *Taylor*, there is no evidence that the paramedics were acting in a law enforcement

8 capacity or at the direction of law enforcement.[10]  And finally, the different approaches

9 emphasize that the right is not so clearly established that any reasonable paramedic would have

10 known that administering a sedative under similar circumstances violates the Fourth

11 Amendment.  Consequently, I grant the defendants' motion for summary judgment on count two.

12              2.  Substantive Due Process

13        Rush and Pickup also move for summary judgment on the claim that they violated Galli's

14 Fourteenth Amendment right to substantive due process.  Galli responds that he has a protected

15 liberty interest in refusing unwanted medical treatment, and the decision to sedate him "purely

16

17 _____

*Hennepin County*, 9 F.4th 757, 761-62 (8th Cir. 2021) (granting qualified immunity to

18 paramedics who sedated a suicidal woman because they were acting as medical responders, not law enforcement officers).

19 [9]  *Green v. City of New York*, 465 F.3d 65, 83-84 (2d Cir. 2006) (denying qualified immunity to

20 fire lieutenant who ordered the medical transport of a conscious, competent adult who objected to medical treatment).

21 [10]  Rush testified that he prepared the ketamine after Galli left the ambulance and before police

22 returned, implying his decision to sedate Galli was not done at the officers' direction. ECF No. 27-6 at 52.  Galli's cite to *Haas v. County of El Dorado* is inapposite. No. 2:12-CV-00265-MCE-KJN, 2012 WL 1414115, at *9 (E.D. Cal. Apr. 23, 2012) (denying paramedic qualified immunity

23 at the motion to dismiss stage because although his patient was non-dangerous and competent to refuse treatment, the paramedic followed officers' orders to sedate the patient).

1    out of malicious intent and desire to punish" shocks the conscience. ECF No. 27 at 24.  Because

2    Rush and Pickup are entitled to qualified immunity, I grant the motion.

3          The Due Process Clause of the Fourteenth Amendment "guarantees more than fair

4    process, and the 'liberty' it protects includes more than the absence of physical restraint."

5    *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997).  As an initial matter, I am skeptical that

6    Galli may bring both a Fourth Amendment excessive force claim against the paramedics for

7    sedating him and a Fourteenth Amendment substantive due process claim for the same

8    behavior.[11]  But because the parties do not address this issue, and because the proper

9    constitutional home for Galli's claims against Rush and Pickup is arguable, I address the

10   Fourteenth Amendment claim on the merits.  To prevail on a substantive due process claim, Galli

11   must show that Rush and Pickup's conduct "shocks the conscience." *Nicholson v. City of Los*

12   *Angeles*, 935 F.3d 685, 692 (9th Cir. 2019) (quotation omitted).  There are two different tests

13   used to determine whether conduct shocks the conscience; which test applies depends on

14   whether officers had time to deliberate before acting or had to make a snap judgment. *Ochoa v.*

15   *City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022).  Galli does not argue which test applies and

16   does not address why the paramedics' behavior meets the "shocks the conscience" standard.

17

---

18   [11] "[W]here a particular Amendment provides an explicit textual source of constitutional
protection against a particular sort of government behavior, that Amendment, not the more

19   generalized notion of substantive due process, must be the guide for analyzing these claims."
*County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quotation omitted).  All claims that

20   law enforcement officers have used excessive force during a seizure should be analyzed under
the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  *Graham* permits a

21   substantive due process analysis for physically abusive government conduct where the Fourth
Amendment does not cover a claim, such as when law enforcement officers unintentionally

22   caused a death during a high-speed chase and thus did not 'seize' the decedent, or when a
decedent's family brought a loss of familial association claim. *Lewis*, 523 U.S. at 843-44; *Ochoa*

23   *v. City of Mesa*, 26 F.4th 1050, 1056-57 (9th Cir. 2022).  But here, it is not clear Galli can
simultaneously claim that the paramedics seized him under the Fourth Amendment and that their
behavior violated a right not explicitly governed by another textual amendment.

1    Even assuming a reasonable jury could find a constitutional violation, Galli does not

2 identify authority showing the right was clearly established such that every reasonable paramedic

3 would have understood their conduct to violate the Fourteenth Amendment.  Galli does not point

4 to a single published case where a Fourteenth Amendment claim proceeded against a paramedic

5 in similar circumstances.  He argues that he has a protected liberty interest in declining

6 psychoactive drugs, but he does not point to any factually similar cases, and "cases establishing

7 broadly that the Constitution protects a citizen's liberty interest in [his] own bodily security . . .

8 define the right at much too high a level of generality to clearly establish a rule of conduct."

9 *Nicholson*, 935 F.3d at 695 (internal quotation marks omitted).  Galli also alludes to his

10 arguments in the excessive force context, but those arguments cannot defeat qualified immunity

11 here. *Nicholson*, 935 F.3d at 696 n.5 ("Fourth Amendment cases cannot clearly establish the

12 contours of the Fourteenth Amendment right, despite similarities between the standards.").

13 Because Galli cannot show that the right at issue was clearly established, I grant the defendants'

14 motion for summary judgment on count three.

15    **B.  State Law Claims**

16    Galli brings state law claims alleging medical negligence against Rush and Pickup;

17 battery against all defendants; negligence against Officers Filsinger and Myers; negligent hiring

18 and training against the City of Henderson, HPD, and the Henderson Fire Department;

19 intentional infliction of emotional distress (IIED) against Rush, Pickup, Filsinger, and Myers;

20 and negligent infliction of emotional distress (NIED) against all defendants.  I have supplemental

21 jurisdiction over these claims under 28 U.S.C. § 1367(a).  I may decline to exercise supplemental

22 jurisdiction if:

23    (1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the
district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original
jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining
jurisdiction.

28 U.S.C. § 1367(c).  If I determine that one or more of these conditions exists, I must then

consider whether exercising jurisdiction would ultimately serve "the principles of economy,

convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357

(1988).  If these considerations do not favor exercising supplemental jurisdiction, then "[I]

should hesitate to exercise jurisdiction over [the] state claims . . . ." *United Mine Workers of Am.*

*v. Gibbs*, 383 U.S. 715, 726 (1966).  Whether to decline the exercise of supplemental jurisdiction

under § 1367(c) lies within my discretion. *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091

(9th Cir. 2008).

Two bases exist for me to deny supplemental jurisdiction.  First, I have resolved the

federal § 1983 claims over which I had original jurisdiction.  Second, at least one of the

plaintiff's state law claims raises unresolved issues of state law that are best determined by the

Nevada courts, such that comity considerations weigh against exercising jurisdiction over the

state law claims.  For example, the parties dispute in their summary judgment briefing whether a

paramedic is a "provider of healthcare" under Nevada Revised Statutes § 41A.017 for purposes

of bringing a professional negligence claim.  Although the parties have conducted substantial

discovery in this case, presumably the discovery responses can be used in the state court case.

And there has been no prior motion practice and I have made no rulings on the state law claims.

Thus, judicial economy, procedural convenience, and fairness to the parties do not counsel in

favor of retaining jurisdiction.  I therefore remand the remaining state law claims to the state court from which this case was removed.

### III.   CONCLUSION

I THEREFORE ORDER that the defendants' motion for summary judgment **(ECF No. 23) is GRANTED IN PART as to the plaintiff's claims under 42 U.S.C. § 1983**.

I FURTHER ORDER that the plaintiff's state law claims are **REMANDED** to the state court from which this case was removed for all further proceedings.  The clerk of the court is instructed to close this case.

DATED this 19th day of July, 2023.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE